**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

BARNARD COLLEGE,

                             Petitioner,

        -against-

TRANSPORT WORKERS UNION OF
AMERICA, AFL-CIO, LOCAL 264,

                             Respondent.

Case No. 1:19-cv-00531-AKH

-------------------------------------------------------------x

## AMENDED PETITION TO VACATE ARBITRATION AWARD

Petitioner Barnard College ("Petitioner," "Barnard" or the "College"), by and through its undersigned attorneys, Jackson Lewis P.C., respectfully alleges as follows:

1. Barnard brings this action to vacate an arbitration award rendered on January 2, 2019 (the "Award") by Arbitrator Carmelo R. Gianino (the "Arbitrator"), in a matter brought before the Arbitrator by the Transport Workers Union of America, Local 264 ("Respondent" or the "Union"). In the Award, the Arbitrator required Barnard to reinstate former employee and Union member Orton Reynolds, despite also finding Mr. Reynolds harmed and humiliated a female colleague and violated Barnard's policy against sexual harassment and discrimination. A copy of the Award is attached hereto as Exhibit A.

### JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.

3. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 185, 9 U.S.C § 10, and 28 U.S.C. § 1331.

4. Barnard and the Union both reside in and regularly conduct business within the jurisdiction of this Court. The arbitration hearing took place in New York, New York.

5. Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

6. Barnard is a not-for-profit educational corporation authorized to conduct business in the State of New York. It operates a private undergraduate women's college in New York City, within this Court's judicial district. At all times relevant herein, Barnard has conducted business within this Court's judicial district. Barnard is an employer within the meaning of Section 2(2) of the National Labor Relations Act ("NLRA"). 29 U.S.C. § 152(2).

7. The Union is, upon information and belief, an association under the laws of the State of New York, having its principal office at 3009 Broadway, New York, New York 10027. The Union is the exclusive representative of certain Barnard employees for purposes of collective bargaining. The Union is a labor organization within the meaning of Section 2(5) of the NLRA. 29 U.S.C. § 152(5).

## COLLECTIVE BARGAINING AGREEMENT

8. Barnard and the Union have been parties to collective bargaining agreements with each other since at least 1947. Barnard and the Union most recently entered into a collective bargaining agreement effective October 1, 2014 (the "CBA"), with a term running through September 30, 2019. A copy of the CBA is attached hereto as Exhibit B.

9. The CBA governs work performed by certain members of the Union employed by Barnard in its Safety and Security Division, namely the regular full-time and part-

time Public Safety Officers and temporary/on-call Public Safety Officers. See Exhibit B, at 1, 2 and 29.

10. The CBA contains a grievance procedure pursuant to which disputes arising out of the collective bargaining relationship between Barnard and the Union are to be resolved. See Exhibit B, at 7-9.

11. The CBA further provides that matters which cannot be solved through the grievance procedure are to be submitted to arbitration. Id., at 8-9.

12. Under Section 14 of the CBA, employees may only be discharged "for just and sufficient cause," and disputes over discharges may be resolved under the grievance and arbitration procedure, described *supra*. Id., at 7.

13. The CBA describes the disciplinary system as "progressive," and further explains that the progressive disciplinary steps are not meant to be "followed by rote," because "the level of disciplinary action taken will depend on the severity of the conduct **as determined by the College**." Id., at 33-34 (emphasis added). The aforementioned language has appeared in collective bargaining agreements between Barnard and the Union since at least 1999.

**FACTUAL BACKGROUND**

14. The present dispute arises out of Barnard's termination of employee Orton Reynolds on or about March 1, 2018.

15. At all times relevant to this Amended Petition, prior to his termination, Mr. Reynolds was employed by Barnard as a Public Safety Officer. As a Public Safety Officer, Mr. Reynolds was responsible for ensuring the safety and security of the young women who comprise Barnard's student body, as well as its staff, faculty and visitors.

16. As a Public Safety Officer, Mr. Reynolds was represented by the Union. Mr. Reynolds' employment was governed by the CBA between Barnard and the Union.

17. All Barnard employees, including Mr. Reynolds, are expected to support Barnard in its mission, which states in part "to address issues of gender in all of their complexity and urgency, and to help students achieve their personal strength that will enable them to meet the challenges they will encounter throughout their lives." Attached hereto as Exhibit C is a copy of Barnard's mission statement.

18. As with all Barnard employees, Public Safety Officers like Mr. Reynolds are also required to comply with Barnard's policies, including Barnard's Policy Against Discrimination and Harassment (the "Policy"). A copy of the Policy is attached hereto as Exhibit D.

19. Among other things, the Policy prohibits "any kind of unlawful discrimination or harassment …. by a member of the College community." Id., at 1. The Policy defines "sexual harassment" as "unwelcome conduct of a sexual nature," including unwelcome "remarks of a sexual nature," that "ha[ve] the purpose or effect of unreasonably interfering with an individual's performance on the job" or "the purpose or effect of creating an intimidating or hostile work … environment for an individual ….." Id., at 2, 3. The Policy also states that "a single extreme incident or repeated incidents may constitute a finding of prohibited discrimination or harassment." Id., at 3. The Policy provides that "[a]ppropriate disciplinary action may be taken against those found to have engaged in discrimination or harassment, with sanctions up to and including dismissal." Id., at 1.

20. Mr. Reynolds received annual training as a Public Safety Officer on the Policy and annually reviewed and acknowledged the Policy. Most recently, he reviewed the Policy

4

on January 23, 2017.  Attached hereto as Exhibit E is Mr. Reynolds' acknowledgment of having reviewed the Policy.

## THE NOVEMBER 14, 2017 HEARING

21. Mr. Reynolds' termination resulted from sexually harassing statements and gestures he directed to another Barnard employee, Terryann Waldron, in front of multiple witnesses on November 14, 2017, in violation of Barnard's Policy Against Discrimination and Harassment.

22. At all times relevant to this Amended Petition, Ms. Waldron was employed by Barnard as its Senior Human Resources Manager for Benefits/Work Life.

23. On November 14, 2017, Mr. Reynolds and Ms. Waldron attended a grievance hearing concerning another Barnard employee represented by the Union.  Mr. Reynolds attended the hearing as the employee's union representative, by virtue of Mr. Reynolds' role as the Union's president.  Ms. Waldron attended the hearing as a witness for Barnard.  Ms. Waldron was not scheduled to testify at the hearing, but rather was called in during the hearing after a break.

24. Also present in the hearing, among others, was Barnard's Employee and Labor Relations Director, Alexcia Gayle, who acted as the hearing officer for the grievance hearing.

25. During the hearing, Ms. Gayle questioned Ms. Waldron briefly.  Ms. Waldron then asked Mr. Reynolds if he had any questions for Ms. Waldron.  According to witness testimony, Mr. Reynolds replied that he did, but then shifted in his seat, repeatedly shifted his gaze between the ceiling and the table in front of him, and did not speak.

26. According to witness testimony, after several seconds, Ms. Gayle invited Mr. Reynolds to begin his questions.  Mr. Reynolds replied that he could not question Ms.

5

Waldron. When Ms. Gayle asked why, Mr. Reynolds replied that he was uncomfortable. When Ms. Gayle asked Mr. Reynolds why he was uncomfortable, Mr. Reynolds gestured toward Ms. Waldron and shouted that Ms. Waldron was making him uncomfortable, because of her attire, because her blouse was cut too low. Mr. Reynolds repeatedly pointed at Ms. Waldron, drawing the attention of those present to Ms. Waldron's blouse, and according to Ms. Waldron, he shouted "look at her, look at her!"

27. Ms. Gayle asked Mr. Reynolds why he made that statement. Mr. Reynolds replied that he would not remain quiet, and was "not going to put up with this anymore."

28. Mr. Reynolds' outburst occurred in a small conference room in which the meeting participants – almost all of whom were men – sat in close quarters, compounding the threatening effect of Mr. Reynolds' raised voice and repeated gestures toward Ms. Waldron.

29. Upset and humiliated by Mr. Reynolds' outburst and statements about her appearance, Ms. Waldron left the room, and began crying in her office. Later that afternoon, Ms. Waldron filed a formal complaint of sexual harassment against Mr. Reynolds.

30. At the time of Ms. Waldron's complaint, Mr. Reynolds was the subject of another investigation, stemming from an accusation of sexual harassment against Mr. Reynolds by another female Barnard employee. Mr. Reynolds was placed on paid administrative leaving beginning in late September 2017 while the investigation was ongoing, although he was permitted on campus to conduct his duties as Union president.

31. On November 18, 2017, Barnard informed Mr. Reynolds that due to the new allegations against him, he would continue on paid administrative leave, pending the conclusion of the investigations.

6

32. Barnard continued investigating the earlier complaint and began a formal investigation into the allegations contained in Ms. Waldron's complaint. The investigation was led by Molree Williams-Lendor, who at all times relevant to the Amended Petition was employed by Barnard as its Title IX Coordinator and Executive Director for Equity.

33. Ms. Williams-Lendor is responsible, *inter alia,* for ensuring Barnard's compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et seq. Pursuant to Title IX, as an educational institution that receives federal funds, Barnard must take certain steps to provide an employment, learning and campus environment free from discrimination and harassment on the basis of sex or gender. Barnard is required to establish and follow complaint and investigation procedures when it receives complaints of sex discrimination, including sexual harassment, and take prompt and immediate remedial action for violations.

34. As a private employer, Barnard is also subject to other federal, state and local anti-harassment and/or anti-discrimination statutes and regulations. In particular, both New York State and New York City both recently enacted legislation mandating that all employers provide annual training and have policies to prevent sexual harassment in the workplace. The policies must include complaint and investigation procedures to be followed for all reports of sexual harassment.

35. During the course of Ms. Williams-Lendor's investigation, she conducted interviews of Mr. Reynolds, Ms. Waldron and others, and reviewed written statements about the events of November 14, 2017, as well as other documents presented to her.

36. Upon the conclusion of her investigation, Ms. Williams-Lendor prepared an investigative report, a copy of which is attached hereto as Exhibit F.

37. In accordance with Barnard's written procedures for adjudicating complaints under the Policy, the report was reviewed by Alina Wong, Barnard's Associate Dean for Student Life, who served as the adjudicator in this case. Ms. Wong found that Mr. Reynolds had violated Barnard's Policy, and recommended termination. A copy of Ms. Wong's communication is attached hereto as Exhibit G.

38. Dean Wong's conclusion and recommendation were further reviewed by Barnard's Vice-President for Campus Services, Gail Beltrone, Mr. Reynolds' ultimate supervisor. Ms. Beltrone concluded that Dean Wong's recommendation was appropriate, given the seriousness of Mr. Reynolds' conduct, his role as a Public Safety Officer in constant contact with and responsible for the safety of young women, and given the clear violation of Barnard's Policy. Ms. Beltrone notified Mr. Reynolds of her decision to terminate his employment, in a letter dated March 1, 2018. A copy of Ms. Beltrone's communication is attached hereto as Exhibit H.

## THE GRIEVANCE AND ARBITRATION

39. On March 1, 2018, the Union filed a grievance alleging Mr. Reynolds' termination violated, in relevant part, Section 14 of the CBA. A copy of the grievance is attached hereto as Exhibit I.

40. On March 5, 2018, the Union filed an unfair labor practice charge against Barnard, alleging Mr. Reynolds' termination violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), (3). A copy of the charge is attached hereto as Exhibit J.

41. On March 7, 2018, the Union and Barnard agreed to submit the grievance to arbitration, pursuant to Section 15, Step D of the CBA. A copy of the parties' communication is attached hereto as Exhibit K; see also Exhibit B, at 8-9.

42. On April 30, 2018, Region 2 of the National Labor Relations Board issued a decision deferring consideration of the unfair labor practice charge to the arbitration process. A copy of the deferral letter is attached hereto as Exhibit L.

43. The matter came before Arbitrator Gianino, in hearings conducted on October 12, 2018, November 19, 2018, November 20, 2018 and December 14, 2018.

44. Barnard and the Union agreed upon the issues to be considered by the Arbitrator, as follows: (1) "did the employer, Barnard College, have just cause to discharge the grievant, Orton Reynolds, effective on or about March 1, 2018; if not, what shall be the remedy"; and (2) "did the employer, Barnard College, violate Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act by discharging Orton Reynolds effective on or about March 1, 2018." Attached hereto as Exhibit M is the portion of the arbitration hearing transcript setting forth the aforementioned issues (at 4).

45. In his January 2, 2019 Award, the Arbitrator found that Mr. Reynolds "certainly" committed a violation of the College's Policy when he sexually harassed Ms. Waldron and confirmed that the effect was to harm and humiliate her. See Exhibit A, at 4. However, he disagreed with the College's decision to terminate Mr. Reynolds, and instead ordered that Mr. Reynolds be "returned to service as quickly as possible" without back pay. Id. The Arbitrator also found that "[t]here was no violation of 8(a)(1) and 8(a)(3) of the National Labor Relations Act." Id. However, the Arbitrator did not answer the question before him of whether or not the College had "just cause" to terminate Mr. Reynolds' employment. Id. The Arbitrator issued his Award prior to obtaining the briefs of the parties, despite having been apprised during the arbitration hearing of the parties' intent to submit briefs.

## FIRST CLAIM FOR RELIEF

## The Arbitrator's Award Violated A Strong Public Policy Interest Against Condoning Workplace Harassment

46. This Court should vacate the Award based on the strong public policy interest against condoning workplace sexual harassment.

47. An arbitrator's award should be vacated if affirming the award would result in the unjust reinstatement of an accused sexual harasser. See e.g., Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840, 845 (2d Cir. 1990) (affirming vacation of an award of reinstatement because the award prevented plaintiff from carrying out its legal duty to eliminate sexual harassment in the work place); citing United Paperworkers Int'l v. Misco, Inc., 484 U.S. 29, 42 (1987).

48. Courts have recognized that combating sexual harassment in the workplace is a "well-defined, and dominant public policy" justifying vacation of an arbitration award. See Newsday, Inc., 915 F.2d at 845.

49. Courts have also recognized that an educational institution has an obligation to combat sexual harassment in educational environments, including amongst employees under Title IX. See Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d 81 (2d Cir. 2011).

50. In his Award, the Arbitrator conceded that Mr. Reynolds "certainly" violated Barnard's anti-discrimination/anti-harassment policy, and that Mr. Reynolds was "wrong to act the way he did…." Id. (emphasis added). See Exhibit A, at 4. The Arbitrator also conceded that Ms. Waldron was "humiliated and hurt by Mr. Reynolds actions." Id.

51. By acknowledging both the harm caused to Ms. Waldron and Mr. Reynolds' policy violation while at the same time ordering Mr. Reynolds' reinstatement, the Award

effectively condones workplace sexual harassment, a result that could engender a hostile and intimidating work environment at Barnard.

52. Barnard places a great deal of trust in its Public Safety Officers, as exemplified by the fact that they are able to access all areas of the campus twenty-four hours a day, seven days a week, including the dormitories of Barnard's young female students. See e.g., Exhibit H, at 1. Public Safety Officers are often the first people community members seek out to report sexual harassment.

53. As a Public Safety Officer, Mr. Reynolds, if reinstated, would be in regular contact with scores of young women on a daily basis, in various states of dress and undress, raising the possibility that he would repeat his harassing behavior. Such a result would be antithetical to Barnard's mission of fostering a supporting community for young women.

54. Such a result would also completely undermine Barnard's efforts to provide its community, including its female undergraduate students, a safe living and working environment. For example, students and employees aware of Mr. Reynolds' history may hesitate to contact Barnard's public safety department in cases of crisis or emergency, for fear of being blamed, judged or harassed.

55. The effect of the Award was to prioritize Mr. Reynolds' employment over Ms. Waldron's right to remain free from harassment in her workplace. By finding Mr. Reynolds "harmed and humiliated" Ms. Waldron, but reinstating him, the Arbitrator has sent the message to Ms. Waldron and the campus community that they are not entitled to a workplace free from sexual harassment.

56. Reinstatement would send a message to employees and students that sexual harassment is not a serious enough violation of policy, as it is not serious enough to merit termination, a message that could lead to an increase in harassing behavior.

57. Moreover, reinstatement could expose Barnard to serious legal liability under applicable federal, state and local anti-discrimination and anti-harassment laws, including Title IX, for returning a confirmed perpetrator of sexual harassment to a position of safety, trust and access.

58. The Award, as a result, runs afoul of a well-defined and dominant public policy against condoning workplace sexual harassment and, therefore, should be vacated.

## SECOND CLAIM FOR RELIEF

### The Arbitrator Exceeded His Authority Under The CBA

59. Additionally, the Award should be vacated because the Arbitrator exceeded his authority by failing to apply the CBA in reaching his Award.

60. The Arbitrator was bound to apply the CBA to determine whether Barnard had "just and sufficient cause" to terminate Mr. Reynolds. See Exhibit B, at 7.

61. Despite that mandate, not once does the Award mention the words "just and sufficient cause," nor does it ever reference the CBA's disciplinary, grievance or arbitration provisions. The Award also fails to address the longstanding CBA language, included in labor agreements between the parties since at least 1999, giving Barnard the right to discipline in its discretion, based on its evaluation of the severity of an employee's conduct. See Exhibit B, at 33-34.

62. Instead, the Award states in a conclusory fashion that termination was "overkill," without even a scintilla of an explanation as to how the Arbitrator reached that conclusion. See Exhibit A, at 4.

63. The Arbitrator also found that the College's termination of Mr. Reynolds' employment did not violate 8(a)(1) and 8(a)(3) of the National Labor Relations Act, but offered no explanation for why he disagreed with the College's exercise of its contractual right to terminate Mr. Reynolds' for his violation of the College's Policy.

64. By failing to engage in any analysis whatsoever, the Award lacks any contractual basis. As a result, the arbitrator dispensed his own brand of industrial justice by ordering Mr. Reynolds' reinstatement, and exceeded his authority under the CBA.

65. Based on the above, the Award should be vacated.

### THIRD CLAIM FOR RELIEF

### The Arbitrator's Award Lacks Evidentiary Support, Is Irrational and Shows A Manifest Disregard For The Law And The CBA

66. The Arbitrator also failed to provide any evidentiary support in reaching his decision, resulting in a wholly irrational Award.

67. The Award does not cite a single piece of evidence, case law or other authority in support of the conclusion that Mr. Reynolds' termination was "overkill." See Exhibit A, at 4.

68. The Award omits any credibility findings, and fails to describe any inferences the Arbitrator may have drawn to reach the Award. While providing a lengthy statement of facts and restatement of the policy and statutory language cited by the parties, the Arbitrator failed to include any coherent statement explaining how he applied the facts under those standards.

The Arbitrator also completely disregarded the contractual language which gives the College complete discretion to determine the severity of discipline.

69. The Award sinks to a wholly irrational level when, immediately after concluding that the termination was "overkill," the Arbitrator concedes that Mr. Reynolds "<u>certainly</u>" violated Barnard's anti-discrimination/anti-harassment policy, that Mr. Reynolds was "<u>wrong to act the way he did</u>….", and that Ms. Waldron was "<u>humiliated and hurt by Mr. Reynolds actions</u>." Id. (emphasis added). As a result of that concession, and given the lack of any other reasoning, the Award lacks even a barely colorable justification for the outcome reached.

70. In fact, the Arbitrator rendered his Award prior to obtaining the briefs of the parties, despite having been apprised during the arbitration hearing of the parties' intent to submit briefs. This underscores the irrational and wholly unsupported nature of the Arbitrator's Award.

71. Moreover, by ordering reinstatement while conceding Mr. Reynolds acted wrongfully and in violation of the College's Policy, the Arbitrator showed a manifest disregard for the law and the CBA, including the College's contractual right to discipline according to the severity of the conduct, as determined by the College, providing yet another basis on which this Court should vacate the Award.

72. In this Circuit, a court may vacate an arbitrator's award for manifest disregard of the law or the CBA if there is strong evidence contrary to the findings of the arbitrator and the arbitrator has not provided an explanation of his decision. See e.g., Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 204 (2d Cir. 1998) (upholding a decision vacating an arbitrator's award, where there was "overwhelming evidence" that the award was wrongly decided, and "the arbitrators did not explain their award").

14

73. Here, the Arbitrator conceded that there is "no dispute" over the facts in this case. See Exhibit A, at 4. More specifically, nowhere in the Award does the Arbitrator dispute that Mr. Reynolds violated the College's Policy by sexually harassing and humiliating Ms. Waldron.

74. Despite confirming that Mr. Reynolds' sexually harassed Ms. Waldron in violation of the College's Policy and acknowledging that Ms. Waldron was hurt and humiliated by his conduct, the Arbitrator improperly substituted his judgment for Barnard's in regards to sanction, completely disregarding Barnard's obligation under federal, state and city law and its Policy to maintain a workplace free from harassment.

75. Moreover, the Award fails to recognize that Barnard has the discretion, under the CBA disciplinary provision negotiated by the parties, to immediately terminate Mr. Reynolds for his egregious conduct. The CBA language allows Barnard to depart from the progressive disciplinary steps when the seriousness of a violation merits, as the College did with Mr. Reynolds due to the severity of his sexual harassment of Ms. Waldron. See Exhibit B, at 33-34.

76. Given the Arbitrator's complete failure to acknowledge Barnard's legal obligation to maintain a harassment-free workplace, and his failure to apply the relevant CBA provision on progressive discipline in his analysis, and considering the Award's irrationality and lack of any evidentiary or contractual support, there are ample grounds on which this Court should vacate the Award in its totality.

[THIS SPACE IS INTENTIONALLY LEFT BLANK]

## **PRAYER FOR RELIEF**

WHEREFORE, Barnard prays for judgment against the Union as follows:

1. That the Court enter judgment on Barnard's Amended Petition to Vacate the Arbitration Award in favor of Barnard and against the Union;

2. That the Arbitrator's Award be vacated as set forth above;

3. That the Court direct the commencement of a rehearing before a different arbitrator;

4. That Barnard be awarded reasonable attorney's fees and other costs incurred herein; and;

5. For any other relief the Court deems just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.

By: _____
Rachel E. Muñoz*
Rachel.Munoz@jacksonlewis.com
Christopher M. Repole
Christopher.Repole@jacksonlewis.com
666 Third Avenue, 29th Floor
New York, New York 10017
Tel: (212) 545-4000
Fax: (212) 972-3213

*Attorneys for Petitioner Barnard College*

*Admission *pro hac vice* pending

Dated:   New York, New York
         January 18, 2019

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 18, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for Respondent via e-mail and U.P.S., at the following address:

Eric J. LaRuffa, Esq.
Rothman Rocco LaRuffa, LLP
3 West Main Street, Suite 200
Elmsford NY 10523
elaruffa@rothmanrocco.com

/s/ Christopher M. Repole
Christopher M. Repole