# Exhibit A

In the Matter of Arbitration Between

BARNARD COLLEGE

and

TRANSPORT WORKERS UNION, LOCAL 264

---

STATEMENT of CLAIM:

The Union, on behalf of Claimant Orton Reynolds, seeks the following remedy(s) for its contention that Barnard College (hereinafter known as "College") improperly dismissed claimant from service:

--restoration to service,

--all back pay associated with his dismissal,

--all seniority and benefits intact.

The Union also wants addressed: Did the College violate Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act by discharging Claimant on or about March I, 2018?

The College, on the other hand, wants the Claimant dismissed from service.

BACKGROUND FACTS:

On March 1, 2018, Mr. Reynolds received an outcome letter from Gail A. Beltrone, Vice President for Campus Services, whereby he was found to be in violation of the College's Policy Against Discrimination and Harassment. Specifically, the Adjudicator, Ms. Alina Wong, the Associate Dean for Student Life, found Mr. Reynolds responsible for creating a hostile work environment when he made sexualized comments about a female staff member's wardrobe and appearance. As a result, he was terminated and banned from campus. Mr. Reynolds has appealed this decision, and the argument is properly before this Arbitrator.

On November 14, 2017, Claimant was representing the Union and one of its members (Carlos Pagan) at a disciplinary hearing. During the course of the hearing, Mr. Reynolds was called upon to examine Terryann Waldron who was a witness against Mr. Pagan. It is here that Mr. Reynolds alleged conduct crossed the line.

---

Ms. Beltrone states, in her termination letter, "As a sanction for the finding of your policy violation, the adjudicator recommended terminating your employment and, for the following reasons, I agree that this is the appropriate sanction for your egregious behavior on November 14th. Barnard is a women's college. As a Public Safety Officer, your responsibilities include protecting the female student

population, as well as the College's staff and faculty. In that capacity you are required to vigilantly and respectfully observe and protect our campus at all times, in spaces where members of our community work, study, live, eat, exercise, and socialize regardless of their gender. You're required and expected to respond respectfully and professionally to calls for assistance no matter how someone looks or what they are wearing."

She states, "You know that Public Safety is our first line of defense, and any emergency we have necessarily involves the young women who place their trust in Barnard and Public Safety. The College and these individuals place their trust in you (meaning Mr. Reynolds). However, your behavior on November 14th, in front of multiple witnesses, was not only unprofessional but also demonstrates that you do not honor that trust. You are also a long-term employee who has been trained numerous times on the College's Policy Against Discrimination and Harassment and are familiar with the College's culture of honoring self-determination and choice, particularly for and by women. There is no excuse for egregious misconduct. Your actions on November 14th were not only disrespectful and harmful to Ms. Waldron, but to the College's mission, purpose, and community as a whole. The College cannot tolerate such actions by an employee, particularly when that employee is entrusted with the safety and security of the campus population. Your conduct failed our expectations and your continued lack of self-awareness is simply incompatible with continued employment at Barnard."

She further states, "There are a range of sanctions that may be applied based on this scenario, including retraining on our policy and work relocation. However, you have received yearly training on this policy, and based on the severity of your violation, and that Barnard is a women's college, where it is unavoidable that you would be in consistent contact with women, there is no position in which you could be moved."

---

So, what was it that Mr. Reynolds did? According to multiple witnesses, his behavior was not only unprofessional, but also rude and insulting. As stated earlier, he is a long-term employee with over twenty-three years of service, who has been trained a number of times on the College's Policy Against Discrimination and Harassment. Suffice it to say that the questions that remain are: should the Claimant be returned to service, and, if so, under what conditions or should the Claimant be dismissed from service.

Mr. Reynolds is a Security Guard at the College. As such, he is responsible for policing the College buildings and grounds to prevent fire, theft, vandalism, illegal entry and harm to the College students. He is also President of Local 264, the highest-ranking official of the Union on campus. On November 14, 2017, as noted before, Mr. Reynolds, was about to question Ms. Waldron regarding whether medical documentation was submitted by Carlos Pagan in order for him (Pagan) to be continued on modified leave. Mr. Reynolds indicated that he had some questions for Ms. Waldron. After a deep pause, Mr. Reynolds stated that he could not question Ms. Waldron because of her attire. Ms. Gayle, the Hearing Officer, asked him for a reason why he could not question Ms. Waldron, and he shouted that she (Waldron) was making him uncomfortable with her attire---her blouse was cut too low.

Messrs. Merrick and Pagan were excused, and Mr. Gonzalez (Executive Director of Public Safety) had already left. The people left in the room were Alexcia Gayle, the Hearing Officer; Ms. Robin Fennell, Department Administrator of Human Resources; Terry Waldron; Union Representative and Treasurer

Rafael Vicioso; and Mr. Reynolds. Ms. Gayle asked Mr. Reynolds if he was serious about his statement. He indicated that he was and that he would no longer "sit around without saying how he feels when he's uncomfortable" and that he has "seen many things happen on the campus that he doesn't say anything about". Ms. Waldron left at this point. Ms. Gayle asked Mr.Reynolds to be more specific about his discomfort, but he continued to say that he was just uncomfortable. As discussions continued, Mr. Reynolds began to raise his voice and Ms. Gayle curtailed the meeting.

It must be noted that both Mr. Pagan and Mr. Vicioso voiced concern about Ms. Waldron's attire both in witness statements and, later, in oral testimony before this Arbitrator. It should also be noted that no other person in the room had a problem with Ms. Waldron's attire.

---

Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce an employee in the exercise of the rights guaranteed in Section 7 of the Act. For example, employees may not respond to a union organizing drive by threatening, interrogating, or spying on pro-union employees, or by providing benefits if they forget about the union.

Section 8(a)(3) forbids discriminating against an employee because of their union activities or sympathies.

Harassment, as defined in Roget's Thesaurus II, is the act of annoying, bothering. exasperating, irritating, pestering, provoking, vexing.

Sexual harassment, as defined in the College's Policy Against Discrimination and Harassment, "is unwelcome conduct of a sexual nature. Sexual harassment may also consist of unwelcome physical contact, requests for sexual favors, visual displays of degrading sexual images, sexually suggestive conduct, or remarks of a sexual nature." Number 4 seems to apply most, as it states, "Such conduct has the purpose or effect of creating an intimidating or hostile work or study environment for an individual or group of individuals". It goes on to say, in pertinent part, "Sexual harassment can occur regardless of the relationship, position or respective sex of the parties".

Discrimination, again as defined in Roget's, is 1-the act or an instance of distinguishing: differentiation, distinction, separation, 2-the ability to distinguish, especially to recognize small differences: refinement, selectiveness, selectivity, and 3-skill in perceiving, discriminating, or judging: acumen, astuteness, clear-sightedness, discernment, eye, keenness, nose, penetration, perceptiveness, percipience, percipiency, perspicacity, sagacity, sageness, shrewdness, wit.

Title IX of the Education Amendments Act of 1972 is a federal law that states, "no person in the United States should, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjugated to discrimination under any education program or activity receiving federal financial assistance".

---

FINDINGS:

The question before this Arbitrator is whether or not Mr. Reynolds' conduct truly rises to a level that meets the criteria for harassment and discrimination. There have been numerous arguments from both

sides regarding the pros and cons of reinstating Mr. Reynolds or not. A decision must be as fair as possible to both the Grievant and the College.

There is no dispute regarding the date in question, the facts in the instant case, and the outcome. The fact that over one year has passed since November 14, 2017 is unfortunate. This is a termination case, one which should have been adjudicated much sooner.

There have been allegations against Mr. Reynolds, both by Ms. Waldron and, more subtly, by others. However, none of those allegations were formalized and entered on an employment record (save Ms. Waldron's 11/14/17 account), so I will not and cannot consider them. The only record I have of worth is the recent allegation against Mr. Reynolds, and that is the only issue with which I will choose to deal.

The College is able to initiate the adjudication process for alleged incidents of misconduct that occurred or may have a continuing effect on campus. The Adjudicator is charged with fairly, promptly and impartially determining, based on a preponderance of the evidence, whether it is more likely than not that policy has been violated upon a review of the investigative materials. Preponderance is defined as the condition or fact of being dominant or controlling.

There seems to be some ambivalence toward the end of January, 2018, as to what to do with Mr. Reynolds. Does he undergo disciplinary sanctions? Does he undergo additional training or retraining? What shall the penalty be?

It seems clear that some disciplinary penalty must be imposed, but I feel that termination, in the instant case, is overkill. Mr. Reynolds is an employee with twenty-three of service with no apparent marks against him. Did a violation occur---certainly. Was Ms. Waldron humiliated and hurt by Mr. Reynolds actions---certainly. Was Mr. Reynolds wrong to act the way he did---certainly. But did this transgression reach the level of termination---no. So, what shall be the penalty?

AWARD:

In this case, Mr. Reynolds shall be returned to service as quickly as possible in line with Barnard's admission/readmission policy. He will forfeit all back pay and lose seniority rights for the time spent on suspension. There also was no violation of 8(a)(1) and 8(a)(3) of the National Labor Relations Act.

*Carmelo R. Gianino*   1/2/19
Carmelo R. Gianino